**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                  :
EQUAL EMPLOYMENT OPPORTUNITY      :
COMMISSION,                       :
                                  :    CIVIL ACTION NO. 06-3801 (MLC)
        Plaintiff,                :
                                  :    MEMORANDUM OPINION
        v.                        :
                                  :
U.S. ALUMINUM, INC., et al.,      :
                                  :
        Defendants.               :
                                  :
```

**COOPER, District Judge**

Plaintiff, the Equal Employment Opportunity Commission, brings this action on behalf of Juanarge Tufino ("Tufino") and George Haberberger ("Haberberger") (collectively, the "charging parties") against defendants, U.S. Aluminum, Inc. ("Aluminum"), U.S. Bronze Powders, Inc. ("Bronze"), and United Automobile, Aerospace & Agricultural Implement Workers of America Local 1668 ("Union") (collectively, "defendants"), alleging that they violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § ("Section") 621, et seq.  (Dkt. entry no. 16, 2d Am. Compl.)  Union alleges a cross claim against Aluminum.  (Dkt. entry no. 18, Union Ans. & Cross-cl., at 4.)  Aluminum and Bronze also allege a cross claim against Union.  (Dkt. entry no. 20, Aluminum & Bronze Ans. & Cross-cl., at 21.)

Aluminum and Bronze now move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure ("Rule") 56(c).

(Dkt. entry no. 29.)  Union separately moves for summary judgment
in its favor.  (Dkt. entry no. 26.)  Plaintiff cross-moves for
summary judgment, or, in the alternative, to stay summary
judgment on select issues and provide plaintiff with additional
discovery.  (Dkt. entry no. 34.)  For the reasons stated herein,
the Court will (1) grant Aluminum's and Bronze's motion for
summary judgment, (2) grant Union's separate motion for summary
judgment, and (3) deny plaintiff's cross motion.[1]

### BACKGROUND

Bronze is a company that manufactures bronze and copper
alloy powders.  (Dkt. entry no. 29, Eugene T. D'Ablemont Aff.
("D'Ablemont Aff."), at ¶ 4.)  Its manufacturing plant and
headquarters are located in Flemington, New Jersey.  (Id.)
Bronze acquired another manufacturing plant from Engelhard
Industries ("Engelhard") in 1973.  (Id. at ¶ 5.)  This plant,
located in Haskell, New Jersey, manufactured aluminum paste.
(Id.)  Bronze incorporated this plant and formed Aluminum as a
wholly-owned subsidiary of Bronze.  (Id. at ¶ 6.)  Aluminum then

---

[1] The Court need not address Union's and plaintiff's
arguments pertaining to whether Union may be held liable under
the ADEA for its conduct here, for the reasons discussed infra.
(See dkt. entry no. 27, Union Br.; dkt. entry no. 33, Pl. Br., at
25-37; dkt. entry no. 38, Union Reply Br.)  The Court will grant
Union's motion for summary judgment for the same reasons it will
grant Aluminum's and Bronze's motion for summary judgment, as
Union stated at oral argument that it agrees with Aluminum's and
Bronze's contention that no violation of the ADEA occurred here.
(Dkt. entry no. 46, 5-9-08 Oral Arg.)

hired all of Engelhard's employees working at the plant.  (Id.)

All of the hourly-paid employees were represented by Union; thus,

as a successor employer, Aluminum assumed Engelhard's preexisting

labor contract with Union.  (Id.)

Aluminum and Union were parties to a collective bargaining

agreement ("CBA") as of August 2003.  (Dkt. entry no. 29,

Aluminum & Bronze Stmt. of Material Facts Not in Dispute

("Aluminum & Bronze Facts"), at ¶ 1.)  Article XIII of the CBA

specifies the terms and conditions of severance pay.  (Dkt. entry

no. 33, Pl. Stmt. of Disputed & Undisputed Facts ("Pl. Facts"),

at ¶ 15.)  At issue here is Article XIII, Section 2 of the CBA

which provides:

> Subject to applicable prevailing law, any employee who is
> over sixty (60) years of age and is entitled to a pension
> under the Company's Pension Plan shall be entitled to a
> severance pay less an amount equal to one-sixtieth (1/60) of
> entitled severance pay for each month of age over 60; e.g.
> an employee who is age 65 and entitled to a pension would
> not be entitled to receive severance pay.

(Dkt. entry no. 33, Konrad Batog Aff. ("Batog Aff."), Ex. N,

Arts. XIII - XVI of CBA.)

Aluminum notified Union in May 2005 that it was going to

shut down the Haskell, New Jersey plant on July 29, 2005, for

economic reasons.  (Aluminum & Bronze Facts, at ¶ 2.)  Aluminum

and Union then engaged in "effects bargaining" within the meaning

of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, et

seq., and reached a plant shutdown agreement in July 2005.  (Id.

3

at ¶ 3; D'Ablemont Aff., at ¶ 12.)[2]  The plant shutdown agreement incorporated the terms of the CBA, including Article XIII, Section 2.  (Aluminum & Bronze Facts, at ¶ 4.)  It also provided, <u>inter</u> <u>alia</u>, an option for employees to receive their severance pay in the form of salary continuation, rather than in a lump sum, so as to allow the employees to continue their health care coverage and avoid paying health insurance premiums pursuant to higher rates under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") through December 2005.  (<u>Id.</u> at ¶ 9; <u>see</u> D'Ablemont Aff., Ex. C, 7-7-05 Letter from Eugene D'Ablemont to Robert Pike ("7-7-05 Letter").)

The pension plan for Aluminum employees who were members of the Union ("the Pension Plan") was also amended after Aluminum decided to shut down the plant, effective June 1, 2005 ("6-1-05 Amendment").  (D'Ablemont Aff., at ¶ 22, Ex. G, 6-1-05 Amendment.)  Prior to that amendment, to be eligible for an immediate pension under the Pension Plan, an employee had to have (1) had at least ten years of pension credited service, and (2) been at least sixty years old.  (D'Ablemont Aff., at ¶ 21, Ex. F, Pension Plan Definitions.)

---

[2] Section 8(a)(5) of the NLRA mandates that a union must be given significant opportunity to bargain with an employer with regard to the effects of a plant shutdown.  <u>See</u> 29 U.S.C. § 158(a)(5); <u>First Nat'l Maint. Corp. v. N.L.R.B.</u>, 452 U.S. 666, 681-82 (1981).

If an employee eligible for an immediate pension decided to retire prior to age sixty-five, however, the employee's monthly pension would be reduced.  (See id., Ex. I, Art. VI of Pension Plan.)  Section 6.01 of Article VI of the Pension Plan provides that "[i]f a Participant receives a Retirement Pension prior to attaining his Normal Retirement Date, such Pension shall be the Participant's Normal Retirement Pension reduced by five-ninths percent (5/9%) for each of the first five (5) years by which the commencement of such payments precedes his Normal Retirement Date . . ."  (Id.)  An employee's "Normal Retirement Age" was age sixty-five.  (Id., Ex. H, Pension Plan Definitions.)  "Normal Retirement Date" is defined as the first day of the month coincident with or next following the date a Participant attains his Normal Retirement Age.  (Id.)  "Normal Retirement Pension" is defined as "the monthly pension to which a Participant becomes entitled upon attaining his Normal Retirement Date."  (Id.)  Pursuant to an amendment to the Pension Plan, effective January 1, 2004 ("1-1-04 Amendment"), the amount of this monthly pension was the product of the number of years of pension credited service and $23.00, if the employee retired between January 2004 and January 2006.  (Dkt. entry no. 37, Linda Trigas Aff. ("Trigas Aff."), Ex. A, 1-1-04 Amendment.)

The Pension Plan also did not allow retired employees to receive their pension benefits in a lump sum when the present

5

value of the employee's pension benefit exceeded $5,000.
(Aluminum & Bronze Facts, at ¶ 10.)  Pursuant to the 6-1-05
Amendment, however, an employee eligible for an immediate pension
would be able to receive a lump sum pension benefit, which would
be "the Actuarial Equivalent of such Participant's Normal
Retirement Pension."  (D'Ablemont Aff., Ex. G, 6-1-05 Amendment,
Ex. J, Art. V of Pension Plan.)  The 6-1-05 Amendment also states
that "such lump sum option must be elected no later than the time
of a distribution made in connection with a termination of the
Plan."  (Ex. G, 6-1-05 Amendment.)  The Pension Plan was
subsequently terminated pursuant to an amendment to the Pension
Plan, effective July 29, 2005 ("7-29-05 Amendment").  (Batog
Aff., Ex. P, 7-29-05 Amendment.)

    At issue here is the benefits the charging parties received
at the time of the plant shutdown.  The charging parties were the
only two Aluminum employees subject to a reduction in their
severance pay pursuant to Article XIII, Section 2, as both were
sixty-three years old and entitled to an immediate pension under
the Pension Plan.  (Aluminum & Bronze Facts, at ¶¶ 7-8.)
Haberberger's severance pay was reduced by $21,604, from $34,112
to $12,507.[3]  (Id. at ¶ 8; Pl. Facts, at ¶ 32.)  Tufino's

---

    [3] Aluminum apparently "deemed" Haberberger eligible to
receive severance pay under Article XIII, Sections 1 and 5 as a
result of the effects bargaining, but now states that Haberberger
is not entitled to any severance pay.  (Aluminum & Bronze Facts,
at ¶¶ 17-18.)  Aluminum further argues that "[s]hould the Court

severance pay was reduced by $7,824, from $11,177 to $3,353.
(Aluminum & Bronze Facts, at ¶ 8; Pl. Facts, at ¶ 33.)

The charging parties also opted to take their severance pay
in the form of salary continuation through December 2005, thereby
avoiding an increase in the cost of their health care coverage in
the amount of $2,200 each.  (Aluminum & Bronze Facts, at ¶ 9.)
They also chose to take an immediate and unreduced lump sum
pension benefit pursuant to the 6-1-05 Amendment.  (Aluminum &
Bronze Facts, at ¶ 13.)  Haberberger received a pension benefit
of $87,793; Tufino received a pension benefit of $60,093.  (Id.)

## DISCUSSION

### I.   Summary Judgment Standard

Rule 56(c) provides that summary judgment is proper if the
pleadings, the discovery and disclosure materials, and any
affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to judgment as a matter of
law.  Id.  The summary judgment movant bears the initial burden
of showing that there is no genuine issue of material fact.
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the
movant has met this prima facie burden, the non-movant must set

---

determine that Aluminum violated the ADEA by applying to
[Haberberger] [Article XIII, Section 2], any damages that may
flow from such violation should be offset by the proper
application to him of Sections 1 and 5 of Article XIII."  (Dkt.
entry no. 39, Aluminum & Bronze Reply Br., at 10.)  The Court
need not address this issue, for the reasons discussed infra.

out specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e)(2). A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a

8

verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II.  Age Discrimination Under The ADEA

### A.   Legal Standards

Section 623 of the ADEA makes it unlawful for an employer, inter alia, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age".  29 U.S.C. § 623(a)(1).  "Compensation, terms, conditions, or privileges of employment" includes "all employee benefits, including such benefits provided pursuant to a bona fide employee benefit plan." 29 U.S.C. § 630(l).

A plaintiff may assert a disparate treatment claim under the ADEA.  Embrico v. U.S. Steel Corp., 404 F.Supp.2d 802, 817 (E.D. Pa. 2005).  When alleging a disparate treatment claim, the plaintiff ultimately must show that age actually motivated or had a determinative influence on the employer's adverse employment decision.  Id.  Such a claim may be proven by direct evidence or indirect evidence.  Id.[4]

---

[4] A plaintiff may also bring a disparate impact claim pursuant to the ADEA.  Embrico, 404 F.Supp.2d at 817.  This claim challenges a specific, facially neutral employment practice that operates to deprive the individual of employment opportunities or otherwise adversely affects that individual's status as an

A policy that facially discriminates on the basis of a protected trait may constitute direct evidence of per se or explicit age discrimination for the purposes of a disparate treatment claim in certain circumstances.  DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 726 (3d Cir. 1995).  Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination.  Id.  "This is because, in a facial disparate treatment case, the protected trait by definition plays a role in the decision-making process, inasmuch as the policy explicitly classified people on that basis.  Thus, when the policy itself displays the unlawful categorization, the employee is relieved from independently proving intent."  Id.  "The touchstone of explicit facial discrimination is that the discrimination is apparent from the terms of the policy itself."  Id. at 727.[5]

_____

employee.  Id.  The plaintiff must show that the practice has an adverse impact on older workers that is not due to reasonable factors other than age.  Id.  Plaintiff does not allege this type of claim, as it asserts that Article XIII, Section 2 of the CBA is facially discriminatory.  (See Pl. Br., at 13-18.)

[5] If an employer's policy is not facially discriminatory, then the plaintiff must prove both unequal treatment and intent to discriminate to establish a disparate treatment claim.  DiBiase, 48 F.3d at 728.  If the plaintiff offers indirect evidence to support these claims, the claims must proceed through a three-step burden-shifting framework.  Embrico, 404 F.Supp.2d at 817-18.  The plaintiff must first establish a prima facie case of age discrimination, which creates an inference that the

10

The ADEA allows an employer to maintain certain age-based benefit plans under certain conditions, however.  Stokes v. Westinghouse Savannah River Co., 206 F.3d 420, 426 (4th Cir. 2000).  One such condition is at issue here.  Section 623(l)(2)(A) specifically addresses the coordination of severance payments and certain health and pension benefits when both are triggered by an event unrelated to age.  Id.; 29 U.S.C. § 623(l)(2)(A).  It provides that an employer does not violate the ADEA when

> solely because following a contingent event unrelated to age--
> (i) the value of any retiree health benefits received by an individual eligible for an immediate pension;
> (ii) the value of any additional pension benefits that are made available solely as a result of the contingent event unrelated to age and following which the individual is eligible for not less than an immediate and unreduced pension; or
> (iii) the values described in both clauses (i) and (ii); are deducted from severance pay made available as a result of the contingent event unrelated to age.

29 U.S.C. § 623(l)(2)(A).  As the court in Stokes explained:

> Congress crafted [Section] 623(l)(2)(A)(ii) to allow benefit coordination if additional pension benefits accrue as a

employer acted with a discriminatory motive.  Id. at 818.  The burden then shifts to the defendant to produce evidence that it had a legitimate business reason for its adverse employment action.  Id.  If the defendant meets this burden, the inference of discriminatory motive is dispelled and the burden shifts back to the plaintiff to show that the defendant's articulated reason is merely a pretext for intentional discrimination.  Id.  The Court need not engage in this analysis, as plaintiff argues that Article XIII, Section 2 is facially discriminatory.  (Pl. Br., at 13-18.)

> result of the age-neutral event that triggers severance pay
> and if the employee is entitled immediately after layoff to
> receive an unreduced pension.  In such a case, the
> additional pension benefits and severance pay are analogous
> and therefore may be appropriately coordinated.  Just as
> severance pay provides short-term wage replacement to
> provide a bridge to a person's next job, immediate pension
> benefits provide a bridge to retirement.

Stokes, 206 F.3d at 427; see 29 U.S.C. § 623(l)(2)(A)(i).

Similarly, Section 623(l)(2)(A)(i) "explicitly permits an

employer to reduce severance payments by the value of retiree

health benefits an employee receives" because of a contingent

event unrelated to age.  29 U.S.C. § 623(l)(2)(A)(i); McCambridge

v. Bethlehem Steel Corp., 873 F.Supp. 919, 925 (E.D. Pa. 1994).

### B.   Legal Standards Applied Here

The reduction in the charging parties' severance pay

pursuant to Article XIII, Section 2 of the CBA was permissible

here under Section 623(l)(2)(A)(ii), as the (1) charging parties

each received an additional pension benefit, in the form of an

immediate, lump sum, unreduced pension benefit, to offset the

reduction in their severance pay, and (2) triggering event for

both the reduction in severance pay and additional pension

benefit was the plant shutdown.  (Aluminum & Bronze Facts, at ¶¶

2, 8, 13; D'Ablemont Aff., Ex. G, 6-1-05 Amendment to Pension

Plan.)  See 29 U.S.C. § 623(l)(2)(A)(ii); Stokes, 206 F.3d at

427.  Before the decision was made to close the plant in May

2005, the charging parties, each at the age of sixty-three, only

would have been entitled to a reduced pension.  (See D'Ablemont

Aff., Ex. I, Art. VI of Pension Plan.)  However, after the
decision was made to close the plant, the 6-1-05 Amendment
entitled the charging parties to an immediate, lump sum pension
benefit in the amount of the "Actuarial Equivalent of such
Participant's Normal Retirement Pension".  (Id., Ex. G, 6-1-05
Amendment, Ex. J, Art. V of Pension Plan.)  The benefit of this
immediate, lump sum, unreduced pension benefit totaled $22,764
for Haberberger and $15,692 for Tufino, more than offsetting the
reductions in their severance pay.  (Aluminum & Bronze Reply Br.,
at 7-8 (noting that for (1) Haberberger, value of pension
benefit, totaling $22,764, offset $21,604 reduction in severance
pay, and (2) Tufino, value of pension benefit, totaling $15,692,
offset $7,824 reduction in severance pay).)[6]

---

[6] The formula to reduce the charging parties' pension
benefit, had they not been permitted by the 6-1-05 Amendment to
take an immediate, lump sum, unreduced pension, as set out in
Article VI of the Pension Plan, would have been as follows:
   (1) Haberberger had 27.25 years of pension credited service.
   (Aluminum & Bronze Reply Br., at 7.)  The Pension Plan
   provided that his Normal Retirement Pension would be that
   number multiplied by $23.00.  (Trigas Aff., Ex. A, 1-1-04
   Amendment.)  Thus, Haberberger's Normal Retirement Pension
   was $626.75 per month.  (Id.; Aluminum & Bronze Reply Br.,
   at 7.)  Applying the 5/9% reduction for each of the twenty-
   four months Haberberger was under the age of sixty-five
   would result in a total reduction in Haberberger's Normal
   Retirement Pension per month of $83.57.  (Id.; D'Ablemont
   Aff., Ex. I, Art. VI to Pension Plan.)  Over a projected
   lifetime of 22.7 years, the total reduction in Haberberger's
   pension would have been $22,764.  (Aluminum & Bronze Reply
   Br., at 7-8.)

Plaintiff contends that Section 623(l)(2)(A) did not allow for the reduction in the charging parties' severance pay, as (1) "the formula used to coordinate and reduce severance pay matters because neither [Section 623(l)(2)(A)] nor any other section of the ADEA, nor any of the legislative history to which [Aluminum and Bronze] cite, allow for severance pay reductions because of age", and (2) the reduction in severance pay did not occur "because of and in relation to the cost of an immediate pension option"; rather, the reduction occurred on the basis of age and pension eligibility.  (Pl. Br., at 20-21.)

The plain language of Section 623(l)(2)(A)(ii) does not support this assertion.  See 29 U.S.C. § 623(l)(2)(A)(ii).  The provision explicitly allows for coordination of severance pay and pension benefits under certain conditions, as discussed supra. See id.  It does not indicate that such coordination must be done with a certain intent or using a certain "formula", or "because of and in relation to the cost of an immediate pension option."

_____

(2) Tufino had 18.67 years of pension credited service. (Id. at 8.)  This number would be multiplied by $23.00 under the Pension Plan.  (Trigas Aff., Ex. A, 1-1-04 Amendment.) Thus, Tufino's Normal Retirement Pension was $429.41 per month.  (Aluminum & Bronze Reply Br., at 8.)  Applying the 5/9% reduction for each of the twenty-four months Tufino was under the age of sixty-five would result in a total reduction in Tufino's Normal Retirement Pension per month of $57.61.  (Id.; D'Ablemont Aff., Ex. I, Art. VI to Pension Plan.)  Over a projected lifetime of 22.7 years, the total reduction in Tufino's pension would have been $15,692. (Aluminum & Bronze Reply Br., at 8.)

14

See id.  Rather, what matters is that the charging parties'
entitlement to both benefits - severance pay and an immediate,
lump sum, unreduced pension benefit - was triggered by the age-
neutral event of the plant shutdown, and the charging parties
both received such a pension, offsetting the reductions in their
severance pay.  See id.

The charging parties were not treated unfavorably compared
to the younger employees here, moreover, as the younger employees
will not be entitled to receive an immediate, lump sum, unreduced
pension benefit if they choose to retire prior to age sixty-five.
(See D'Ablemont Aff., Ex. G, 6-1-05 Amendment, Ex. J, Art. V to
Pension Plan; Batog Aff., Ex. P, 7-29-05 Amendment, Art. XII of
Pension Plan.)  The 6-1-05 Amendment provides that the lump sum
option "must be elected no later than the time of a distribution
made in connection with a termination of the Plan."  (D'Ablemont
Aff., Ex. G, 6-1-05 Amendment.)  The Pension Plan was terminated,
effective July 29, 2005.  (Batog Aff., Ex. P, 7-29-05 Amendment.)
Thus, the option to take a lump-sum distribution of an unreduced
pension terminated on July 29, 2005.  (D'Ablemont Aff., Ex. G, 6-
1-05 Amendment; Batog Aff., Ex. P, 7-29-05 Amendment to Pension
Plan.)

Article XII of the Pension Plan provides that, after
termination of the Pension Plan, "[d]istributions . . . shall be
made . . . in accordance with the provisions of Articles IV and
V."  (Batog Aff., Ex. P, Art. XII of Pension Plan.)  Article V,

15

in turn, provides that distribution of an employee's unreduced Normal Retirement Pension occurs only when an employee reaches the Normal Retirement Date, the first day of the month coincident with or next following the date an employee attains his Normal Retirement Age of sixty-five.  (D'Ablemont Aff., Ex. J, Art. V of Pension Plan, Ex. H, Pension Plan Definitions.)  Thus, in contrast to the charging parties, the younger employees will have to wait until age sixty-five to receive an unreduced pension benefit.  (Aluminum & Bronze Reply Br., at 9.)  Moreover, the younger employees will not have the option of receiving their pension benefit in lump sum form.  (See D'Ablemont Aff., Ex. G, 6-1-05 Amendment; Batog Aff., Ex. P, 7-29-05 Amendment.)

Plaintiff also argues that the immediate, lump sum, unreduced pension benefit the charging parties each received was not a permissible offset pursuant to Section 623(l)(2)(A)(ii) because the charging parties had already accrued this benefit "before the July 2005 plant shutdown agreement and before the July 29, 2005 plant shutdown."  (Pl. Br., at 22-23.)  This argument is without merit.  Nothing in the provision requires the additional pension benefits to accrue after formal "effects bargaining" and a plant shutdown agreement is reached so as to be coordinated with a reduction in severance pay.  See 29 U.S.C. § 623(l)(2)(A)(ii).  Rather, the statute provides that the value of such benefits "made available solely as a result of the

16

contingent event unrelated to age" may be deducted from severance pay "following a contingent event unrelated to age".  Id.  It is undisputed that the decision to close the plant in May 2005, a contingent event unrelated to age, triggered both the (1) 6-1-05 Amendment providing the additional pension benefits, and (2) reduction in the charging parties' severance pay that occurred thereafter.  (Aluminum & Bronze Facts, at ¶¶ 2, 8; D'Ablemont Aff., Ex. G, 6-1-05 Amendment.)  Thus, the provision's requirements are met.  See 29 U.S.C. § 623(l)(2)(A)(ii).[7]

Plaintiff further argues that "there is no 'additional pension benefit' in providing a lump sum payment as opposed to an annuity since the value of the lump sum is the actuarial equivalent of an annuity." (Pl. Br., at 23.)  However, even if receiving the immediate, unreduced pension benefit in lump-sum form was not an "additional" pension benefit within the meaning of Section 623(l)(2)(A)(ii), the charging parties each received

---

[7] Plaintiff also argues that the continued medical coverage the charging parties received was not a permissible offset within the meaning of Section 623(l)(2)(A)(i) because (1) this coverage did not fall within the meaning of "retiree health benefits" as defined in the ADEA, and (2) all laid-off employees received this benefit.  (Pl. Br., at 21-22.)  The Court need not address this argument.  Even if the Court were to decide that the $2,200 the charging parties saved by salary continuation did not qualify as a retiree health benefit within the meaning of Section 623(l)(2)(A)(i), the amount of additional pension benefit the charging parties received more than offset the reduction in their severance pay, as discussed supra.

an "additional" pension benefit by receiving an immediate,
unreduced pension benefit prior to age sixty-five, as discussed
supra. (Aluminum & Bronze Facts, at ¶ 13; see D'Ablemont Aff.,
Ex. H, Pension Plan Definitions, Ex. I, Art. VI of Pension Plan.)

Plaintiff also contends that the reduction in the charging
parties' severance pay is not offset by the value of the
immediate, lump sum, unreduced pensions they received because the
Pension Plan provided for a reduction in an employee's pension of
5/9% per year, as opposed to per month, for each of the five
years before the age of sixty-five. (Pl. Br., at 24-25.) Thus,
according to plaintiff's calculation, prior to the 6-1-05
Amendment, reducing (1) Haberberger's unreduced pension of
$87,793 by 5/9% for two years would result in a total reduction
of $975.47, and (2) Tufino's unreduced pension of $60,093 by 5/9%
for two years would result in a total reduction of $667.70. (See
id. at 25.) As such, plaintiff argues that the reduction in the
charging parties' severance pay was not offset by receiving
immediate, lump sum, unreduced pension benefits. (Id.)

Plaintiff's calculation is not supported by the plain
language of the Pension Plan. That language provides that the
"Normal Retirement Pension" is to be "reduced by five-ninths
percent (5/9%) for each of the first five (5) years by which
commencement of such payments precedes his Normal Retirement
Date" if an employee retires prior to age sixty-five.

18

(D'Ablemont Aff., Ex. I, Art. VI of Pension Plan.)  The "Normal

Retirement Pension" is a monthly payment.  (Id., Ex. H, Pension

Plan Definitions.)  Thus, the 5/9% reduction is multiplied by the

number of months the employee retired prior to age sixty-five,

and applied on a monthly basis to reduce to each monthly pension

payment; the reduction is not applied once per year to the total

amount of the Normal Retirement Pension.  (See id., Ex. H,

Pension Plan Definitions, Ex. I, Art. VI of Pension Plan.)[8]

## CONCLUSION

For the reasons stated supra, the Court will (1) grant the

motion by Aluminum and Bronze for summary judgment, (2) grant

Union's separate motion for summary judgment on the same grounds,

---

[8] The Court notes that the Social Security Act also applies
a similar reduction formula for Social Security benefits if an
individual retires prior to the individual's "retirement age".
See 42 U.S.C. § 402(q)(1).  The statute provides:

> [I]f the first month for which an individual entitled to an
> old-age . . . insurance benefit is a month before the month
> in which such individual attains retirement age, the amount
> of such benefit for such month and for any subsequent month
> shall . . . be reduced by--
> (A) 5/9 of 1 percent of such amount if such benefit is an
> old-age insurance benefit . . . multiplied by
> (B)(i) the number of months in the reduction period for such
> benefit . . . or
> (ii) if less, the number of such months in the adjusted
> reduction period for such benefit . . .

Id. 20 C.F.R. § 404.410 further explains that the reduction due
to early retirement occurs on a monthly, rather than an annual,
basis: "The reduction in your primary insurance amount is based
on the number of months of entitlement prior to the month you
attain full retirement age.  The reduction is 5/9 of 1 percent
for each of the first 36 months and 5/12 of 1 percent for each
month in excess of 36."  20 C.F.R. § 404.410.

19

and (3) deny plaintiff's cross motion for summary judgment, or, in the alternative, to stay summary judgment on select issues and provide plaintiff with additional discovery.  The Court will issue an appropriate order and judgment.[9]

                                             <u>s/ Mary L. Cooper</u>
                                           **MARY L. COOPER**
                                           United States District Judge

**Dated:** May 23, 2008

---

[9] The Court will deny as moot the motion by Aluminum and Bronze to strike plaintiff's reply memorandum (dkt. entry no. 42), as the Court did not rely on plaintiff's reply memorandum here.